**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| **McGUIREWOODS LLP** | * | |
| Plaintiff | * | |
| **v.** | * | **Civil Action No.: 3:10cv354** |
| **GREAT NORTHERN INSURANCE COMPANY** | * | |
| | * | |
| Defendant | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**DEFENDANT GREAT NORTHERN INSURANCE COMPANY'S
BRIEF IN SUPPORT OF CROSS-MOTION
FOR JUDGMENT ON THE PLEADINGS**

Jeffrey R. Schmieler (VSB No. 32175)
Alan B. Neurick (*pro hac vice*)
Lisa N. Walters (VSB No. 72291)
Samuel T. Wolf (*pro hac vice*)
*Saunders & Schmieler, P.C.*
The Montgomery Center, Suite 1202
8630 Fenton Street
Silver Spring, Maryland 20910
(301) 588-7717
(301) 588-5073 Facsimile
schmielerj@sslawfirm.com
neuricka@sslawfirm.com
waltersl@sslawfirm.com
wolfs@sslawfirm.com

*Counsel for Defendant
Great Northern Insurance Company*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES      iii

INTRODUCTION      1

FACTUAL BACKGROUND      2

     I.      Facts preceding the underlying complaints      2
         A.   The Getchell/Allcott original complaint      2
         B.   The Getchell/Allcott amended complaint      6
         C.   The McGuireWoods/Barr Complaint      7

ARGUMENT      9

     I.      Standard of Review      9
         A.   Virginia law governing an insurer's duty to defend      9
         B.   Great Northern owed No Duty to Defend because Spencer's alleged injuries do not fall within the Definition of "Personal Injury" under the Plain Language of the Policy      10
         C.   No Duty to Defend was Owed under the Terms and Provisions of the Policy for the alleged Abuse of Process committed by the underlying Defendants      17
         D.   Great Northern had no duty to defend because the allegations of the underlying complaints invoke the application of the "Publications with Knowledge of Falsity" exclusion      20
         E.   Great Northern had no duty to defend because the allegations of the underlying complaints invoke the application of the "Expected or Intended Injury" exclusion      23
         F.   Great Northern had no duty to defend because the insurance does not apply to damages sustained by former partners of McGuireWoods      26
         G.   Great Northern had no duty to defend because the Legal or Other Professional Services Exclusion applies to preclude the potential for indemnification      28
         H.   Getchell and Allcott are not insureds with respect to the claims made only against them      29

CONCLUSION      29

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Atlantic Mut. Ins. Co. v. Atlanta Datacom*,
   139 F.3d 1344 (11th Cir. 1998)…………………………………....…….....……19-20

*Bohreer v. Erie Ins. Group*,
   475 F. Supp. 2d 578 (E.D. Va. 2007)……………………………………………………10

*Edwards v. City of Goldsboro*,
   178 F.3d 231 (7th Cir. 1999)……………………………………....…………………9

*Fed. Ins. Co. v. Cablevision Sys. Dev. Co.*,
   637 F. Supp. 1568 (E.D.N.Y. 1986)…………..………………………………………19

*Fuisz v. Selective Ins. Co. of America*,
   61 F.3d 238 (4th Cir. 1995)……………………………………………………………25

*General Products Co. v. Meredith Corp.*,
   526 F. Supp. 546 (E.D. Va. 1981)……………………………………………………12

*Heil Co. v. Hartford Accident & Indem. Co.*,
   937 F. Supp. 1355 (E.D. Wisc. 1996)………..……………………………………..20

*Heritage Mut. Ins. Co. v. Advanced Polymer Tech.*,
   97 F. Supp. 2d 913 (S.D. Ind. 2000)……………….…………………………………13

*Lunsford v. American Guar. & Liab. Ins. Co.*,
   18 F.3d 653 (9th Cir. 1994)……………………………………….…….……18-19

*Markel Am. Ins. Co. v. Staples*,
   2010 U.S. Dist. LEXIS 7148 (E.D. Va. Jan. 28, 2010)…………..………………......…22

*Northern Ind. Gun & Outdoor Shows v. City of S. Bend*,
   163 F.3d 449 (7th Cir. 1998)…………………………………………………..………9

*Parker Supply Co. v. Travelers Indem. Co.*,
   588 F.2d 180 (5th Cir. 1979)…………..……………………………………......…20

*Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.*,
   407 F.3d 631 (4th Cir. 2005)……………………………………………….……13-14

*R.A. Hanson Co. v. Aetna Ins. Co.*,
 612 P.2d 456 (Wash. App. 1980)……………………………………………..……20

*San Filippo v. US Trust Co.*,
 1987 U.S. Dist. LEXIS 3960 (S.D.N.Y. 1987)………………..…………………………20

*Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*,
 377 F.3d 408 (4th Cir. 2004)………………………………………………………14

*The Morrow Corp. v. Harleysville Mut. Ins. Co.*,
 101 F.Supp. 2d 422 (E.D. Va. 2000)………………..…………………………………...11

**STATE CASES**

*Ayyildiz v. Kidd*,
 220 Va. 1080, 266 S.E.2d 108 (1980)………………..……………………………18

*CNA Cas. v. Seaboard Surety Co.*,
 222 Cal. Rptr. 276 (Cal. Ct. App. 1986)……………………………………………...…19

*Copp v. Nationwide Mut. Ins. Co.,*
 279 Va. 675 (2010*)*……………………………………………..…………………………19

*Erie Ins. Group v. Buckner*,
 489 S.E.2d 901 (N.C. App. 1997)……………………………………………25-26

*Eslami v. Global One Communications*,
 78 Va. Cir. 17 (1999)……..……………………………………………………...12

*Fleming v. Moore*,
 221 Va. 884, 275 S.E.2d 632 (1981)…………………………..………………………...25

*Gazette v. Harris*,
 325 S.E.2d 713 (Va. 1985)………………………………………………...…………12

*Gigante v. Target*,
 52 Va. Cir. 141 (2000)……………………………………………………...…………12

*Graphic Arts Mut. Ins. Co. v. C.W. Warthen Co.*,
 240 Va. 457, 397 S.E. 2d 876 (1990)……………………………………………….....14

*Johnson v. Insurance Co. of North Am.*,
 232 Va. 340, 350 S.E.2d 616 (1986)………………………………………….………23

*Lerner v. Safeco*,
    219 Va. 101, 245 S.E.2d 249 (1978)……………..………………………………………10

*Morris v. Travelers Indemnity Co.*,
    31 Va. Cir. 306 (1993)……………………………………..……………………23-24

*Partnership Umbrella, Inc. v. Fed. Ins. Co.*,
    260 Va. 123, 530 S.E.2d 154 (2000)……………………………………....…………13

*PMA Capital Ins. Co. v. U.S. Airways, Inc.*
    271 Va. 352, 626 S.E.2d 369 (2006)……………………..………...……………14

*Reilly v. Shepherd*,
    273 Va. 728, 643 S.E.2d 216 (2007)……………………………..………………18

*Reisen v. Aetna Life & Cas. Co.*,
    225 Va. 327, 302 S.E.2d 529 (1983)………………………………………………10

*Salzi v. Virginia Farm Bureau Mut. Ins. Co.*,
    263 Va. 52, 556 S.E. 2d 758 (2002)…………………………………………...14

*State Farm Fire and Casualty Co. v. Thomas*,
    63 Va. Cir. 339 (2003)……………………………………………...……23

*Triangle Auto Auction, Inc. v. Cash*,
    238 Va. 183,  380 S.E.2d 649 (1989)……………….……………………….…….18

*VEPCO v. Northbrook Property & Cas. Ins. Co.*,
    252 Va. 265, 475 S.E.2d 264 (1996)………………………………………….10

*Virginia Farm Bureau Mut. Ins. Co. v. Williams*,
    278 Va. 75, 677 S.E.2d 299 (2009)...................................................................9

*Virginian Ry. Co. v. Hood*,
    152 Va. 254, 146 S.E. 284 (1929)……………………….……………………14

*Wilson v. Holyfield*,
    227 Va. 184, 313 S.E.2d 396 (1984)…………………………….……………14

**STATUTES/RULES**

Fed. R. Civ. P. 10(c)…………………………………………………………………9

Fed. R. Civ. P. 12(b)…………………………………………………………………9

Fed. R. Civ. P. 12(c)………………………………………………………………....9

**OTHER SOURCES**

*The American Heritage Dictionary* (2d college ed. 1991)…..………………………………………13

*Black's Law Dictionary* 538 (9th ed. 2009)……………………………………………………...13

*Black's Law Dictionary* (7th ed. 1999)………………………………………………………13

*Restatement (Second) of Torts* § 623A (1977)……………………………………….……...12

*Restatement (Second) of Torts* § 626 (1977)…..……………………………………….……...12

*Virginia Model Jury Instructions – Civil* (2010)……...…………………………………………12

*Webster's Third New International Dictionary* 653 (unabridged 2002)………….……………...13

*Webster's Third New International Dictionary* (unabridged 1993)…………………………..13

## **INTRODUCTION**

The Court should enter a judgment on the pleadings in favor of Defendant Great Northern Insurance Company ("Great Northern") because when the applicable clear and unambiguous terms and provisions of the Great Northern policy are applied to the allegations of the complaints for which McGuireWoods LLP ("McGuireWoods") claims a duty to defend was triggered for itself as well as current or former employees or partners, it is clear that McGuireWoods cannot satisfy its burden of proof that it satisfied the "personal injury" coverage under the policy and that the policy's exclusions clearly exclude the potentiality of any coverage which would otherwise exist.

An in-depth analysis of the injuries alleged in the underlying complaints reveals that they are in fact outside the definition and plain meaning of what constitutes a "personal injury" under the at issue Great Northern policy.  Moreover, even if the injuries alleged satisfied the definition of "personal injury," there are several clear and unambiguous exclusions which clearly apply to eviscerate the potentiality of any such coverage when the allegations in the underlying complaints are carefully and fully analyzed:  (1) Expected or Intended Injury exclusion; (2) the Publications with Knowledge of Falsity exclusion; (3) the Insureds or Affiliates exclusion; and (4) the Legal or Professional Services exclusion.  Thus, the underlying complaints failed to raise the potential of an injury for which Great Northern agreed to provide coverage, and there was no duty to defend.  Moreover, there was no duty to defend the underlying suit against Getchell and Allcott because they were not insureds under the policy based upon the allegations asserted against them.  Great Northern properly refused to provide a defense when the allegations of the underlying complaints are analyzed in full and when they are applied to the plain and clear language of the terms and provisions of the policy.

**FACTUAL BACKGROUND**

**I.      Facts preceding the underlying complaints**

Christopher Spencer of the law firm Bowman and Brooke, LLP represented defendant Wintergreen Partners, Inc. ("Wintergreen") at trial in a Virginia state personal injury action styled *Grigg v. Wintergreen Partners, Inc.*  Compl. ¶ 13.  Christopher Spencer is a former partner in McGuireWoods.  **Exhibit 5.**  McGuireWoods acknowledged as much in a letter to Great Northern which was attached as an exhibit of, and incorporated into, Great Northern's Amended Answer.  *Id.*  McGuireWoods was subsequently retained to also represent Wintergreen.  Compl. ¶ 13.  After Wintergreen lost at trial, the matter was appealed; however, the appeal was subsequently dismissed by the Supreme Court of Virginia "because the original trial transcript was not timely filed as required."  *Id.* at ¶ 14.  The finger-pointing back and forth about why the transcript was not timely filed and the resulting dismissal of the appeal became the subject of articles in the *Virginian-Pilot* and the *National Law Journal*.  *Id.* at ¶ 15.

**II.     Allegations of the underlying complaints**

      **A.      The Getchell/Allcott original complaint**

After the articles appeared in the *Virginian-Pilot* and the *National Law Journal*, Spencer filed a complaint against E. Duncan Getchell and William Allcott.  **Exhibit 2**.  In this first complaint, Spencer alleged that Getchell and Allcott defamed him as part of an "unlawful plan that [they] hatched in the hope of saving [Getchell's] troubled nomination to" the United States Court of Appeals for the Fourth Circuit.  Ex. 2, ¶ 5.  Getchell's nomination to the bench "encountered [an] obstacle when news reporters started asking questions about the role that he and . . . McGuireWoods LLP . . . , played in the" dismissal of the *Grigg* appeal.  *Id.*

2

Spencer alleges that out of fear "that negative publicity about the dismissal would doom his judicial aspirations, Getchell . . . joined with Allcott in an unlawful conspiracy to shift blame away from Getchell and his firm and to spread the false message that Spencer . . . was responsible for the failure to file the transcript and the resulting dismissal." *Id.* at ¶ 6. Carrying out the conspiracy, Getchell and Allcott "willfully and maliciously defamed Spencer and prejudiced him in his profession." *Id.* These acts of defamation included statements "that Spencer was a fraud, that Spencer was unfit to practice law and that Spencer was responsible for a mistake that was Getchell's and [McGuireWoods'] alone." *Id.* at ¶ 7.

Spencer alleges that Wintergreen's insurer filed a complaint against Spencer and his firm for legal malpractice, yet no claim was brought against Getchell or McGuireWoods. *Id.* at ¶ 27. Spencer claims that the insurer's complaint became "a linchpin of [Getchell and Allcott's] scheme to cover up" Getchell's mishandling of the appeal. *Id.* at ¶ 28. After Getchell's nomination to the bench and receiving inquiries from reporters, "Getchell and Allcott determined . . . to falsely shift blame for the *Grigg* dismissal . . . toward Spencer." *Id.* at ¶ 34. Getchell and Allcott "agreed on a plan" that "Getchell would appear to stay 'above the fray' and make no public comment about the *Grigg* appeal, while Allcott would make and spread false statements in an effort to . . . falsely shift blame for the *Grigg* dismissal to Spencer." *Id.* at ¶ 35.

Spencer painstakingly describes each step of the alleged conspiracy that was intended to cause his professional disgrace. After "Getchell declined to comment to the *Virginian-Pilot* reporter, the reporter called the White House for comment on Getchell's role in the appeal." *Id.* at ¶ 36. When "[a] White House spokesman told the reporter he would get back to him," Getchell and Allcott "advised the White House about [Wintergreen's insurer's complaint], which [Getchell and Allcott] falsely represented as being an accurate statement of the facts surrounding

the *Grigg* appeal," all in an effort "to shape the White House response" to the reporter's request for comment. *Id.* at ¶¶ 36-37.

Spencer claims that "[b]y representing the [insurer's complaint] to the White House as true statements of the facts, Getchell and Allcott adopted, ratified and published the . . . false statements contained" in the insurer's complaint. The allegations in the insurer's complaint include that: (1) Spencer failed "to provide [Wintergreen] with competent, reasonable and appropriate legal representation it was entitled to"; (2) Spencer failed to meet the deadline for filing the transcript; (3) Spencer failed "to protect [Wintergreen's] rights as required under the applicable rules"; (4) Spencer failed to exercise "the requisite legal knowledge, skill and diligence necessary"; (5) Spencer "accept[ed] representation of [Wintergreen's] legal claims without the necessary legal knowledge and skill"; (6) Spencer "intentionally and/or deliberately withheld and/or concealed the material fact that the trial transcript was not timely filed and that the appeal was not perfected and preserved"; (7) Spencer "falsely represented that the case was preserved for appeal"; and (8) Spencer intended to mislead Wintergreen and cover up his failure to file the trial transcript. *Id.* at ¶ 38.

Spencer alleges that Getchell and Allcott knew the insurer's complaint contained false statements of fact when they provided it to the White House. *Id.* at ¶ 39. As a result, and "[e]xactly as [Getchell and Allcott] intended, the White House spokesman . . . revealed the existence of the [insurer's complaint] to the reporter, vouched for [its] truth . . . and specifically pointed out that Spencer, not Getchell, was being sued for the mistakes on the *Grigg* appeal." *Id.* at ¶ 40. And "[e]xactly as [Getchell and Allcott] intended, the *Virginian-Pilot* reporter innocently relied on [their] misinformation and incorporated the false allegations . . . in his story about Getchell's nomination." *Id.* at ¶ 41.

4

After the *Virginian-Pilot* article was published, "[a] reporter for the *National Law Journal* began working on a new story and called Getchell and the LLP for comment." *Id.* at ¶ 43. To further the "unlawful conspiracy," Allcott "willfully and maliciously provided false information designed to deceive the *National Law Journal* and [its] readers." *Id.* at ¶ 44. Allcott blamed Spencer for the failure to file the trial transcript, published a copy of the insurer's complaint to the reporter and warranted, "[T]he facts are as represented in the malpractice suit." *Id.* at ¶¶ 45-46. This information was contained in an October 10, 2007 article. *Id.* at ¶ 44.

Spencer alleges that Allcott made "these false statements for the purpose and with the intent to shift blame for the dismissal of the *Grigg* appeal to Spencer . . . to injure Spencer in his reputation, business and profession." *Id.* at ¶ 50. Spencer states that "Allcott knew when he was making these false statements that the falsehoods would be published in a journal of national and international circulation among members of Spencer's profession, and that these falsehoods would be published on the Internet, where they would be found in any search of Spencer's name and could never be erased." *Id.* at ¶ 51. Spencer makes clear that "[a]ll of these false statements were made intentionally, maliciously and with knowledge of their falsity, and had the effect of defaming Spencer personally and professionally." *Id.* at ¶ 52.

After this exhaustive statement of facts, Spencer's original complaint against Getchell and Allcott includes five counts, which Spencer labels as follows: Count I – defamatory statements related to the *Virginian-Pilot* article; Count II – defamatory statements related to the *National Law Journal* article; Count III – conspiracy to injure Spencer in his reputation, business and profession; Count IV – negligent defamation in connection with the *Virginian-Pilot* [sic] article; and Count V – negligent defamation in connection with the *National Law Journal* article. Each count incorporates by reference the fifty-two preliminary paragraphs setting forth the

factual details of his claims.   *See id.* at ¶¶ 53, 63, 74, 82, 92.   Thus, each count includes allegations of the facts described above.

### B.      The Getchell/Allcott amended complaint

In late October 2008, Spencer amended his complaint against Getchell and Allcott, who remained the only two defendants in the action.   **Exhibit 3**.   The amended complaint goes into greater detail regarding Getchell and Allcott's responsibility for the dismissal of the *Grigg* appeal.   Ex. 3, ¶¶ 14-27.   Spencer states clearly, "At all times, Getchell and the law firm knew that they – and not Spencer – bore the entire responsibility for perfecting and prosecuting Wintergreen's appeal in the *Grigg* case."   *Id.* at ¶ 27.   Spencer explains why Wintergreen's insurer only sued him, and not Getchell or McGuireWoods: someone at McGuireWoods had "sought to persuade [the insurer] that the insurers really did not have a viable claim for malpractice," and McGuireWoods offered a "goodwill payment."   *Id.* at ¶¶ 30-31.   Eventually, the insurer and McGuireWoods agreed that the insurer would sue only Spencer in order to shift the blame away from Getchell and in order to get Spencer to admit fault through a coerced settlement.   *Id.* at ¶¶ 39-41.   The "plan was hatched even though everyone involved knew full well that it was based on falsehoods."   *Id.* at ¶ 42.

The amended complaint contained eight counts.   Spencer split the "malicious defamation" and "negligent defamation" counts related to the *Virginian-Pilot* article into separate counts against Getchell and Allcott.   The only truly new count Spencer added was Count IV for abuse of process.   Again, each count incorporates by reference the preliminary statements of fact containing the substantive allegations of Spencer's claims.   *See id.* at ¶¶ 65, 76, 87, 97, 105, 113, 117, 121.

### C.      The McGuireWoods/Barr Complaint

In September 2008, Spencer filed a separate action against McGuireWoods LLP, John S. Barr and McGuireWoods Consulting, LLC.  The complaint many of the same allegations found in the amended complaint against Getchell and Allcott, with additional facts supporting the claims against the new defendants.  **Exhibit 4**.

The complaint alleges that Barr is a partner in McGuireWoods, acting as "the law firm's inside 'general counsel' [who] struck secret deals to delay malpractice lawsuits against the firm for as long as possible."  Ex. 4 at ¶¶ 2, 9.  He alleges that Barr attempted "to drum up evidence against Spencer by calling former employees and making misleading statements to them to cajole them into joining his plan."  *Id.* at 9.  Worse, Barr "even took steps to see that a bogus lawsuit was filed against [Spencer] – and not Getchell or the law firm – so that it would appear that [Spencer] was to blame for the *Grigg* mistake" even though "Barr believed that lawsuit was meritless."  *Id.*

After the *Grigg* appeal was dismissed, "[t]he law firm's management asked Barr to try to find a way to control the damage," and Barr "proceeded on three tracks."  *Id.* at ¶¶ 29-30.  He first developed the firm's position on the dismissal in *Grigg* in order "to exonerate the law firm, no matter what the truth really was."  *Id.*  Second, he met with "a senior official of Wintergreen's insurers" to convince them to file a lawsuit replete with false allegations.  *Id.* at ¶ 31.  And, third, Barr offered the "goodwill payment" to the insurer.  *Id.* at ¶ 32.

After Wintergreen's insurer filed its complaint against Spencer, "[t]he law firm and Barr resolved to use the [insurer's complaint] as one of their public relations weapons," considering "it a perfect tool to support the firm's 'position' that Spencer – and not Getchell and the law firm – was responsible for botching the *Grigg* appeal."  *Id.* at ¶ 45.  McGuireWoods LLP and Barr

"enliste[ed] the expertise of William Allcott and [McGuireWoods Consulting LLC] to . . . coordinate the law firm's responses to the media with Getchell's." *Id.* at 46.

Spencer claims the insurer's complaint was given to the White House despite everyone's knowledge "that 'the firm position' and" the statements made about Spencer in the insurer's complaint were false. *Id.* at ¶ 57. Spencer states that Barr, McGuireWoods LLP and McGuireWoods Consulting intended that the White House would reveal the existence of the insurer's complaint to the *Virginian-Pilot* reporter, vouch for the complaint's truth and "specifically point[] out that Spencer, not Getchell, was being sued." *Id.* at ¶ 58.

Spencer alleges that "Getchell, Barr, the law firm, Allcott and the consulting company conferred" and "decided that Getchell would say nothing directly or for public attribution" to the *National Law Journal*. *Id.* at ¶ 62. Instead, "Allcott and the consulting company would respond in the name of the law firm, but they would do it in a way that advanced Getchell's interests as well as the law firm's." *Id.* In accordance with this scheme:

> Allcott and the consulting company, acting at the specific direction of Getchell and law firm chairmen Richard Cullen, called the *National Law Journal* and falsely stated the law firm's "position" that Barr had concocted for such occasions. He made false statement [sic] of fact that Spencer was "responsible for perfecting the [*Grigg*] appeal, including filing the trial transcripts with the court." Allcott noted that the [insurer's complaint] named Spencer, and not Getchell or the law firm, and vouched for the truth of the allegations in the [insurer's complaint] . . . . He stated, "[T]he facts are as represented in the malpractice suit . . . ." Allcott even provided a copy of the [insurer's complaint] to the *National Law Journal*. In these ways, Allcott, overtly for the law firm and covertly for Getchell, willfully and maliciously published false information designed to harm Spencer.

*Id.* at 63.

This complaint contains a total of ten counts: Counts I through IV – malicious defamation; Count V – abuse of process; Count VI – conspiracy; and Counts VIII through X – negligent defamation. Again, Spencer incorporates by reference all of the substantive factual

allegations from the preliminary paragraphs into each count of the complaint.  *See id.* at ¶¶ 77, 88, 101, 113, 126, 134, 142, 146, 150, 154.

## ARGUMENT

### I.     Standard of Review

The standard of review for a Rule 12(c) motion for judgment on the pleadings is the same standard as applied under Rule 12(b) motion to dismiss.  *Edwards v. City of Goldsboro*, 178 F.3d 231 (7th Cir. 1999).  Exhibits to the pleadings are considered to be incorporated into the pleadings under Rule 10(c), and therefore may be considered in resolving motions under Rule 12(c).  *E.g.*, *Northern Ind. Gun & Outdoor Shows v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998) (copies of letters attached to pleadings properly considered in determining motion for judgment on the pleadings).

#### A.     Virginia law governing an insurer's duty to defend

Interpretation of an insurance policy is a question of law for the court.  *Virginia Farm Bureau Mut. Ins. Co. v. Williams*, 278 Va. 75, 80, 677 S.E.2d 299, 302 (2009).  Insurance policies are interpreted, like any other contract, "by determining the parties' intent from the words . . . used."  *Id.*  Where a term is unambiguous, a court is to "apply its plain meaning as written."  *Id.* at 81, 677 S.E.2d at 302.  But if the language "can be understood to have more than one meaning," it is construed "in favor of coverage and against the insurer."  *Id.*  Additionally, "[b]ecause insurance policies usually are drafted by insurers, [courts] construe ambiguous policy language purporting to exclude certain occurrences from coverage most strongly against the insurer," and an "insurer must use language that is reasonable, clear and unambiguous."  *Id.*

An insurer owes a duty to defend a suit against its insured "whenever the complaint alleges facts and circumstances, some of which would, if proved, fall within the risk covered by

the policy." *VEPCO v. Northbrook Property & Cas. Ins. Co.*, 252 Va. 265, 268, 475 S.E.2d 264, 265 (1996) (quoting *Lerner v. Safeco*, 219 Va. 101, 104, 245 S.E.2d 249, 251 (1978)).  There is no duty to defend, however, "when it clearly appears from the initial pleading the insurer would not be liable under the policy contract for *any* judgment based upon the allegations." *Reisen v. Aetna Life & Cas. Co.*, 225 Va. 327, 331, 302 S.E.2d 529, 531 (1983) (emphasis in original).  In deciding whether there is a potential for coverage, "the party seeking coverage bears the ultimate burden of proving by a preponderance of the evidence that it is entitled to coverage, the insurer bears the burden of proving that an exclusion applies." *Bohreer v. Erie Ins. Group*, 475 F. Supp. 2d 578, 585 (E.D. Va. 2007).

> **B.     Great Northern owed No Duty to Defend because Spencer's alleged injuries do not fall within the Definition of "Personal Injury" under the Plain Language of the Policy**

Under the policy, Great Northern agrees to provide the following "Advertising and Personal Injury Liability Coverage":

> Subject to all of the terms and conditions of this insurance, we will pay damages that the **insured** becomes legally obligated to pay by reason of liability:
>
> •       imposed by law; or
>
> •       assumed in an **insured contract**
>
> for **advertising injury** or **personal injury** to which this coverage applies.
>
> This coverage applies only to such **advertising injury** or **personal injury** caused by an offense that is first committed during the policy period.
>
> Other than as provided under the Investigation, Defense and Settlements and Supplementary Payments sections of this contract, we have no other obligation or liability to pay sums or perform acts or services under this coverage.

**Exhibit 1**; Form 80-02-2000, p. 3.

The policy clearly defines "personal injury" as:

**Personal injury** means injury, other than **bodily injury**, **property damage** or **advertising injury**, caused by an offense of:

A.      false arrest, false detention or other false imprisonment;

B.      malicious prosecution;

C.      wrongful entry into, wrongful eviction of a person from or other violation of a person's rights of private occupancy of a dwelling, premises, or room that such other person occupies, if committed by or on behalf of its landlord, lessor or owner;

D.      electronic, oral, written or other publication of material that:

      1.      libels or slanders a person or organization (which does not include disparagement of goods, products, property or services); or

      2.      violates a person's right of privacy; or

E.      discrimination, harassment or segregation based on a person's age, color, national origin, race, religion or sex.

Form 80-02-2000, p. 30.

This Court should review the plain language of the policy and, after giving a full analysis of the allegations in the underlying complaints, give full effect to the clear and unambiguous terms and provisions of the policy. A plain reading of the instant policy makes clear that coverage will be provided for slander or libel so long as the defamation committed by the insured does not consist of the disparagement of a person's services. Because Spencer's allegations of slander or libel consist entirely of claims that the underlying defendants disparaged his services as a practicing lawyer, the "personal injury" requirement of the policy is not satisfied and there is duty to defend.

The policy terms are clear and unambiguous. Where terms are unambiguous, they must be given their plain and ordinary meaning. *See Partnership Umbrella, Inc. v. Fed. Ins. Co.*, 260 Va. 123, 530 S.E.2d 154 (2000). Both *Webster's International Unabridged Dictionary* and

*Black's Law Dictionary* have been hisg4   torically cited by Virginia courts (and other jurisdictions) to interpret the common meaning of the terms at issue.  The court in *Heritage Mut. Ins. Co. v. Advanced Polymer Tech.* turned to both, as well as *The American Heritage Dictionary*, to interpret the common understanding of what disparaging a person's services means in the context of an insurance coverage grant provision.  *Id.*, 97 F. Supp. 2d 913, 931-32 (S.D. Ind. 2000) (citing *Black's Law Dictionary* (7th ed. 1999) (disparaging a person's service is to "to dishonor something or someone by comparison" or "to unjustly discredit or detract from the reputation of another's property, product or business"); *Webster's Third New International Dictionary* (unabridged 1993) ("to lower in esteem or reputation" or "to speak slightingly of") ); *see also The American Heritage Dictionary* (2d college ed. 1991) ("to speak of as unimportant to small"; "belittle" or "to reduce in esteem or rank").

*Black's Law Dictionary* defines "disparagement" as "a derogatory comparison of one thing with another"; "the act or an instance of castigating or detracting from the reputation of, esp[ecially] unfairly or untruthfully"; "a false and injurious statement that discredits or detracts from the reputation of another's character, property, product, or business"; or "reproach, disgrace or indignity."  *Black's Law Dictionary* 538 (9th ed. 2009).  *Webster's Third New International Dictionary* defines "disparagement" as the "diminution of esteem or standing" or "the expression of a low opinion of something."  *Webster's Third New International Dictionary* 653 (2002).

In Virginia "an insurance policy is a contract to be construed in accordance with the principles applicable to all contracts."  *Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 636 (4th Cir. 2005) (applying Virginia law) (quoting *Seabulk Offshore, Ltd. v. Amer. Home Ins. Co.*, 377 F.3d 408, 419 (4th Cir. 2004) (citing *Graphic Arts Mut. Ins. Co. v. C.W. Warthen Co.*, 240 Va. 457, 397 S.E. 2d 876, 877 (1990)).  As with other contracts, when

interpreting an insurance policy courts must not strain to find ambiguities. *Resource Bankshares,* 407 F.3d at 636 (quoting *Salzi v. Virginia Farm Bureau Mut. Ins. Co.*, 263 Va. 52, 556 S.E. 2d 758, 760 (2002). As in the case of any other contract, the words used are given their ordinary and customary meaning when they are susceptible of such construction. *Salzi*, 556 S.E. 2d at 760 (quoting *Graphic Arts*, 397 S.E. 2d at 877)). "It is the function of the court to construe the contract made by the parties, not to make a contract for them." *Wilson v. Holyfield*, 227 Va. 184, 187, 313 S.E.2d 396, 398 (1984). Accordingly,

> [t]he contract is construed as written, without adding terms that were not included by the parties. When the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning. Words that the parties used are normally given their usual, ordinary, and popular meaning. No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly.

*PMA Capital Ins. Co. v. U.S. Airways, Inc.*, 271 Va. 352, 358, 626 S.E.2d 369, 372-73 (2006) (internal quotation marks and citations omitted). In addition, the contract is "construed as a whole. [Its] provisions are to be harmonized when possible, [and] effect is to be given to every stipulation when it can reasonably be done." *Virginian Ry. Co. v. Hood*, 152 Va. 254, 258, 146 S.E. 284, 285 (1929).

And if one thing is clear from Spencer's complaints, it is that the only alleged wrong he suffered was the disparagement of his services, as an attorney. As the amended complaint against Getchell and Allcott states, the defendants intended to destroy Spencer's reputation for their own benefit:

> The complaint against Spencer would be made especially and unnecessarily salacious. It would not only claim that Spencer had breached the implied contract that a lawyer owes his client, it would accuse him of much, much more. It would accuse him of general professional incompetence. It would claim he was too ignorant to try cases or handle appeals. It would accuse him of rank dishonesty. It would call him a fraud and a sneak. It would claim he was generally and utterly

13

> unethical.  It would also be filed in Wintergreen's name, making it appear falsely that even Spencer's long-time client thought he was to blame.  It was thought that these vicious allegations would make Getchell and the law firm look better by making Spencer look worse, and that they would increase the harm to Spencer and the pressure on Spencer to settle.

Ex. 3, ¶ 41.

And all of the underlying complaints have at their core the underlying defendants' participation in the creation and repeated publications of Wintergreen's insurer's complaint against Spencer, which alleged that: (1) Spencer failed "to provide [Wintergreen] with competent, reasonable and appropriate legal representation it was entitled to"; (2) Spencer failed to meet the deadline for filing the transcript; (3) Spencer failed "to protect [Wintergreen's] rights as required under the applicable rules"; (4) Spencer failed to exercise "the requisite legal knowledge, skill and diligence necessary"; (5) Spencer "accept[ed] representation of [Wintergreen's] legal claims without the necessary legal knowledge and skill"; (6) Spencer "intentionally and/or deliberately withheld and/or concealed the material fact that the trial transcript was not timely filed and that the appeal was not perfected and preserved"; (7) Spencer "falsely represented that the case was preserved for appeal"; and (8) Spencer intended to mislead Wintergreen and cover up his failure to file the trial transcript.  Ex. 2, ¶¶ 38, 47; Ex. 3, ¶ 55; Ex. 4, ¶ 56.

In addition, every defamation count in the underlying complaints includes the allegation that the defendants' statements "imputed to Spencer unfitness to perform the duties of his employment for profit as an attorney," "imputed to Spencer a want of integrity in the discharge of his employment as an attorney"; and "prejudiced Spencer in his profession."  Ex. 2, ¶¶ 55-57, 66-68, 84-86, 95- 97; Ex. 3, ¶¶ 68-70, 79-81, 89-91, 113, 117, 121; Ex. 4, ¶¶ 80-82, 92-94, 105-07, 117-19, 142, 146, 150, 154.

McGuireWoods in its motion, asserts that the policy language "disparagement of goods, products, property or services" refers to an "entirely separate category of torts," specifically that of the tort of injurious falsehood. [1]  Plaintiff's Reply at 4.  However, McGuireWoods' analysis is unfounded and because of the plain and clear language of the policy and is unpersuasive when the controlling Virginia law is examined in full.

While the Restatement (Second) of Torts § 623A and some states have recognized injurious falsehood as an independent tort, a review of the case law of Virginia confirms that Virginia – whose law controls the interpretation of the policy – has not.[2]  A review of the Virginia's Model Jury Instructions further confirms that there is not one jury instruction or

---

[1]    Under Virginia law, McGuireWoods cannot create a duty to defend where it does not otherwise exist under the terms and provisions of the insurance policy.  This is because, under established Virginia law, the doctrines of waiver and estoppel are prohibited from being used to enlarge the coverage of an insurance policy.  *The Morrow Corp. v. Harleysville Mut. Ins. Co.*, 101 F.Supp. 2d 422, 429 n.7 (E.D. Va. 2000) (citations omitted); *Norman v. Ins. Co. of N. America*, 218 Va. 718, 729, 239, S.E.2d 902, 907 (1978) ("By means of the doctrine of waiver a contract may not be reformed so as to create a liability for conditions which are specifically excluded by the very means of the instrument.").  Thus, while McGuireWoods uses in its motion an *ad hominem* attack against Great Northern for a position it took pre-suit as to the "personal injury" issue, McGuireWoods has no legal challenge that Great Northern has somehow legally waived or should be estopped in the instant suit because of the pre-suit position.  Moreover, the position is one-sided because when McGuireWoods itself acknowledges in its brief that when its point contact – who was an attorney and partner of the firm – took some contrary pre-suit positions in its discussions with Great Northern, those positions were instead characterized by McGuireWoods as "honest mistakes" rather than as being "disingenuous."

[2]    Virginia recognizes the torts of slander of title and trade libel.  However, neither tort has anything to do with the disparagement of a person's services.  Slander of title, under Virginia law, involves the disparagement of <u>property</u> including land, chattel or other intangible things.  *See Gigante v. Target*, 52 Va. Cir. 141, 146 (2000).  To be protected, the property interest must be "transferable and therefore salable or otherwise capable of profitable disposal."  *Id.*  Trade libel, on the other hand, involves the disparagement of quality and is referred to as "product disparagement," "disparagement of goods," or "slander of goods" -- trade libel involves statements which discredit the quality of utility of a <u>producer's goods or products</u>.  *See Restatement (Second) of Torts* § 626; *General Products Co. v. Meredith Corp.*, 526 F. Supp. 546, 553 (E.D. Va. 1981).  Indeed, the Restatement supports the position that neither tort has to do with disparaging a person's services.  *See Restatement (Second) of Torts* § 623A (the comments and illustrations make no reference to any disparagement of services).

reference to a tort of injurious falsehood in Virginia.  *See Virginia Model Jury Instructions –*
*Civil* (2010).

When Virginia courts have used the term "injurious falsehood," it is in referencing or
defining defamation.  *E.g, Eslami v. Global One Communications*, 78 Va. Cir. 17, 21 (1999) ("In
general, defamation consists of the publication of an injurious falsehood."); *see also Gazette v.*
*Harris*, 325 S.E.2d 713, 724-25 (Va. 1985).  However, this phrasing does not suggest that
"injurious falsehood" is considered to be a separate tort, but that it is a part of the understanding
of what is a defamation claim under Virginia law.

If the insurer had intended to include in its coverage the specific tort of injurious
falsehood (or even the torts of slander of title or trade libel) as McGuireWoods contends, then
the policy would have clearly stated as much.  But where the policy is plainly written, the Court
is to presume that the words have their usual, ordinary and popular meaning.

Assuming, *arguendo*, that McGuireWoods wanted an insurance policy covering
defamation that disparages a person's services, it should have either tried to purchase an
endorsement to provide the coverage or it should have purchased another carrier's policy.
Regardless, this issue before the Court involves a Virginia insurance policy which is to be
analyzed under Virginia law and an insured who is either referencing an offense clearly not
covered by the policy or that is referencing a tort that is unrecognized by Virginia law -- the
McGuireWoods interpretation of the plain language of the policy is stretched beyond common
reason.

The Court must give plain meaning to the clear language of the policy and apply the only
analysis that can result of the factual allegations of the Spencer complaints:  The disparagement
of Spencer's services as an attorney is the only type of defamation Spencer alleges; Spencer does

not complain of any statement that does not disparage the services he provides as an attorney. As a result, the defamation claims of the underlying complaints all fall outside the definition of a "personal injury" covered by the insurance policy, and there was no duty to defend triggered.

**C.  No Duty to Defend was Owed under the Terms and Provisions of the Policy for the alleged Abuse of Process committed by the underlying Defendants**

Great Northern had no duty to defend Spencer's claims for abuse of process because an injury caused by abuse of process simply is not an injury covered by the policy.  The substantive allegations of the abuse of process count against Getchell and Allcott are as follows:

> 97.    Defendants used the [insurer's complaint] as a whip and a club to harm Spencer as part of Defendants' and their co-conspirators' public campaign of defamation and misinformation against Spencer.  They abused the process to cover up the law firm's and Getchell's professional misconduct, to the business and professional reputation of the law firm, to try to eliminate an obstacle to Getchell's ascension to the federal bench and to harm and humiliate Spencer.

> 98.    Defendants maliciously misused and misapplied the AIG Complaint primarily to accomplish ulterior purposes not lawfully or properly attainable by it.

> 99.    Defendants took actions not proper in the regular prosecution of the lawsuit, as described above.

Ex. 3.  Identical allegations are found in the complaint against McGuireWoods and Barr.  Ex. 4, ¶¶ 127-29.

"Abuse of process" is not found in the list of enumerated offenses capable of causing "personal injury" under the policy.  While malicious prosecution is an offense capable of causing "personal injury" under the policy, abuse of process and malicious prosecution are two very distinct torts, which have different elements and protect different interests.  An "[a]buse of process involves the wrongful *use* of process *after* it has been issued.  The essential elements of an abuse of process claim are: (1) the existence of an ulterior purpose; and (2) an act in the use of

process not proper in the regular prosecution of the proceedings." *Triangle Auto Auction, Inc. v. Cash*, 238 Va. 183, 184, 380 S.E.2d 649, 650 (1989) (internal quotations and citation omitted) (emphasis in original). On the other hand, malicious prosecution requires proof of "four essential elements: that the prosecution (1) was malicious, (2) instituted by or with the cooperation of the defendant, (3) without probable cause, and (4) terminated in a manner not unfavorable to the plaintiff." *Reilly v. Shepherd*, 273 Va. 728, 732, 643 S.E.2d 216, 218 (2007). Additionally, where a plaintiff alleges malicious prosecution "stemming from civil proceedings the plaintiff must allege and prove arrest of his person, seizure of his property or special injury incurred." *Ayyildiz v. Kidd*, 220 Va. 1080, 1084, 266 S.E.2d 108, 111 (1980).

McGuireWoods primarily relies upon an out-of-jurisdiction case from the Ninth Circuit applying California insurance law for the proposition that the offenses of "abuse of process" and "malicious prosecution" are the same. However, in pursuit of such an argument, McGuireWoods ignores both Virginia insurance and personal injury law as well as the weight of the other jurisdictions which have not adopted such a position.

McGuireWoods cites the Ninth Circuit for the assertion that "malicious prosecution" is ambiguous. (Pl.'s Reply at 8.) (citing *Lunsford v. American Guar. & Liab. Ins. Co.*, 18 F.3d 653, 656 (9th Cir. 1994)). The *Lunsford* Court based this conclusion on the California duty to defend law, which differs greatly from Virginia duty to defend law. California adheres to the minority view, applying the most liberal of duty to defend analyses: the duty to defend under California law is triggered not only where the four corners of the complaint present a potential for indemnification, but it is also triggered where the complaint does not allege a covered claim, if the complaint *potentially* could be amended in the future to state a claim that would be covered. In California, the duty to defend arises even if *potential* allegations could be raised in a possible

future amended Complaint based upon the facts alleged or because of extrinsic evidence. *Lunsford*, 18 F.3d at 654 (quoting *CNA Cas. v. Seaboard Surety Co.*, 222 Cal. Rptr. 276, 279 (Cal. Ct. App. 1986); *see also Fed. Ins. Co. v. Cablevision Sys. Dev. Co.*, 637 F. Supp. 1568, 1577 (E.D.N.Y. 1986). Virginia, however, uses the majority approach and applies the more restricted "eight corners rule," subject to narrow exceptions. *Copp v. Nationwide Mut. Ins. Co., 279 Va. 675, 683 (2010).* Under the "eight corners rule," only the "allegations in the complaint and the provisions of the insurance policy are to be considered in deciding whether there is a duty on the part of the insurer to defend and indemnify the insured." *Id.* In *Copp*, the Virginia Supreme Court clarified that, in certain circumstances not present for this issue, a court may look outside the eight corners of the complaint and the policy to extrinsic evidence; but even this approach does *not* involve an analysis of what could possibly have been alleged through an amended complaint. In fact, in the *Lunsford* case cited by McGuireWoods, the Ninth Circuit itself distinguished its holding when using most liberal approach from how other jurisdictions would have reached their conclusion with the more traditional duty to defend analyses. *Lunsford,* 18 F.3d at 656. McGuireWoods has misread the Ninth Circuit's ruling in *Lunsford* and ignored the weight of the authority from other jurisdictions more applicable to a Virginia policy.

Jurisdictions that use the same duty to defend analysis as Virginia have examined the issue and determined that the term "malicious prosecution," as used in an insurance policy's definition of "personal injury," is not ambiguous and that the different tort of "abuse of process" is not covered. *See Atlantic Mut. Ins. Co. v. Atlanta Datacom*, 139 F.3d 1344 (11th Cir. 1998) (holding that the term "malicious prosecution" is unambiguous and does not include claims of abusive litigation); *Heil Co. v. Hartford Accident & Indem. Co.*, 937 F. Supp. 1355, 1363 (E.D.

Wisc. 1996) (finding the offense of "malicious prosecution" unambiguous, that only a lawsuit against the insured for malicious prosecution would create an obligation to defend because "[t]he tort of abuse of process is more broadly defined than the tort of malicious prosecution and may provide a remedy where malicious prosecution will not"); *Parker Supply Co. v. Travelers Indem. Co.*, 588 F.2d 180, 182-83 (5th Cir. 1979) (". . . the policies' reference to the offense of 'malicious prosecution' was not ambiguous and only a suit against Parker for that offense would have created an obligation for the insurers to defend and indemnify."); *R.A. Hanson Co. v. Aetna Ins. Co.*, 612 P.2d 456, 459 (Wash. App. 1980) (the term "malicious prosecution" is not ambiguous and claims for malicious prosecution are covered but claims for abuse of process are not); *San Filippo v. US Trust Co.*, 1987 U.S. Dist. LEXIS 3960, at *4 (S.D.N.Y. 1987) ("This Court finds nothing ambiguous about the phrase 'malicious prosecution.'  That phrase clearly refers to the traditional action at common law. If the parties intended in some way to broaden this common sense interpretation of this common law phrase, they clearly could have so provided").

Under Virginia law, an action for abuse of process is *not* the same as an action for malicious prosecution.  The definition of "personal injury" in the policy does *not* include an injury caused by abuse of process.  Spencer's claims for abuse of process in his underlying complaints do not trigger a duty to defend, because there is no potential that those claims could ever be covered.

> **D.    Great Northern had no duty to defend because the allegations of the underlying complaints invoke the application of the "Publications with Knowledge of Falsity" exclusion**

The facts and circumstances alleged in the underlying complaints fall squarely within the clear exclusion for "Publications with Knowledge of Falsity."  That exclusion states:

This insurance does not apply to . . . **personal injury** arising out of any electronic, oral, written or other publication of content or material by or with the consent of the **insured**:

- with knowledge of its falsity; or

- if a reasonable person in the circumstances of the insured would have known such content or material to be false

Form 80-02-2000, p. 15.

McGuireWoods incorrectly argues that "Great Northern cannot rely on this defense because the allegations in Spencer's Complaints include causes of action alleging that the defamatory statements were negligently made without knowledge of their falsity." McGuireWoods' argument fails for two fundamental reasons. First, McGuireWoods entirely ignores that the policy clearly states that "This insurance does not apply [where] a reasonable person in the circumstances of the insured would have known such content or material to be false." Because the exclusion encompasses both statements made with knowledge of falsity *and* statements that a reasonable person would know to be false, all of the allegations of the underlying complaints fall within the exclusion. Second, the "negligent defamation" counts of the underlying complaints all incorporate by reference all of the substantive facts contained in the paragraphs prior to the alleged causes of action, disposing of any notion that the underlying defendants could have acted without knowledge of the falsity of their statements.

The policy excludes defamatory statements both where the insured knows that the statement is false *and* where a reasonable person would know the statement is false. The allegations of the underlying complaints all fall within these two clearly defined categories and therefore fall within the exclusion. The preliminary paragraphs of all the underlying complaints and all of the counts alleging "malicious defamation" abound with clear allegations that the underlying defendants knew that the contents of their communications were false. The

"negligent defamation" counts of the original complaint against Getchell and Allcott both include the allegation that "Getchell and Allcott knew or should have known that the statements were false.  Getchell and Allcott published those statements negligently."  Ex. 2, ¶¶ 88, 99.  The negligent defamation counts in the two other complaints all contain the same naked, legal conclusion that the defendants "acted carelessly and negligently in the manner alleged."  Ex. 3, ¶¶ 114, 118, 122; Ex. 4 ¶¶ 143, 147, 151, 155.  These bare conclusory charges, of course, are meaningless since the complaints contain no facts to support them.  However, if anything can be inferred from these legal conclusions it is that Spencer again attempts to allege that the defendants "knew or should have known that the statements were false."

All of the preliminary allegations of fact are incorporated by reference into the negligent defamation counts.  These preliminary allegations of fact include all of the allegations of intentional conduct and knowledge of falsity.  The facts, as opposed to conclusions, asserted in the underlying complaints make clear that Spencer's cursory inclusion of "negligent defamation" counts is merely an attempt "to end-run an intentional acts exclusion," and their "mere presence . . . is insufficient" to create a duty to defend.  *Markel Am. Ins. Co. v. Staples*, 2010 U.S. Dist. LEXIS 7148 at *12 (E.D. Va. Jan. 28, 2010) (unpublished).

This Court has before it all it needs: the applicable policy provisions and the underlying complaints.   The policy excludes personal injury caused by statements the insured either knew to be false <u>or</u> reasonably should have known to be false.  The underlying complaints state that the defendants either knew their statements were false <u>or</u> reasonably should have known that their statements were false.   The underlying claims raised no potential that Great Northern would be required to ultimately indemnify McGuireWoods.  Great Northern had no duty to defend the underlying claims, and it properly denied a defense.

**E.      Great Northern had no duty to defend because the allegations of the underlying complaints invoke the application of the "Expected or Intended Injury" exclusion**

Great Northern properly denied a defense because Spencer's claims are all excluded by the "Expected or Intended Injury" exclusion in McGuireWoods' policy.  The policy states:

> This insurance does not apply to . . . **personal injury** arising out of an offense, committed by or on behalf of the **insured**, that:
>
> - is intended by such **insured**; or
>
> - would be expected from the standpoint of a reasonable person in the circumstances of such **insured**

to cause injury.

Form 80-02-2000, p. 14.  Although either prong of the exclusion eliminates any potential for coverage, both prongs apply:  All of the injuries alleged in Spencer's complaints are injuries the underlying defendants intended to cause and any reasonable person in the circumstances of the defendants would have expected the claimed injuries to have occurred.  Under Virginia insurance law, "*It is not sufficient that the insured intentionally undertook the underlying act, albeit negligently*; rather the insured *must have intended the resulting harm*."  *State Farm Fire and Casualty Co. v. Thomas*, 63 Va. Cir. 339 (2003); *Johnson v. Insurance Co. of North Am.*, 232 Va. 340, 350 S.E.2d 616 (1986).

This provision also excludes from coverage resulting harm that is not just expected, but that reasonably should be expected.  Under Virginia insurance law, injuries that are expected are excluded from coverage by the expected or intended injuries exclusion.  In *Morris v. Travelers Indemnity Co.*, 31 Va. Cir. 306 (1993), the Virginia court explained:

In paragraph 7 of Count I[3] of the Amended Motion for Judgment, Sheriff Morris alleges that when Edward Morris fired wildly outside, "Edward Morris should have realized, from his knowledge of existing circumstances and conditions, that there was a strong probability that his conduct might result in injury to another."  There is no allegation here that the injuries were "intended."

However, the policy excludes coverage for acts committed where bodily injuries are "expected."  Obviously injuries that are expected are different from injuries that are intended.  To "Expect" a happening is "To look forward to the probably occurrence of.  To consider reasonable or due."  *The American Heritage Dictionary of the English Language*, p. 252.  Sheriff Morris contends that Edward Morris should have known there was a "strong probability that his wild shooting would cause injury to another.  To this court, that is the same as saying that Edward Morris should have expected that his wild shooting would cause injury to Sheriff Morris or to anyone else who may have been in the line of fire.  This court sees no difference between a probability of injury and an expectation of injury where the conduct is alleged to have been done wantonly or willfully.

\*     \*     \*

If injuries were probable or expected, then the language of the policy excludes coverage for such injuries.

*Id.*, 311-312.

Spencer could not have recovered for the claims in his underlying complaints without establishing that the underlying defendants either intended to cause the alleged injuries *or* that the underlying defendants reasonably should have expected to cause the alleged injuries.  First, Spencer alleged only that the underlying defendants intended to injure him: there is no combination of facts alleged in the underlying complaints that would allow for proof of defamation without simultaneously proving that the underlying defendants actually intended to cause Spencer harm.  The factual underpinnings of Spencer's complaints make clear that his injuries were not allegedly caused by mistake or accident, but were injuries that were expected to

---

[3]     Sheriff Morris described Count I of his Amended Complaint as an action for "willful and wanton negligence" and, *inter alia*, asserted that the discharge of the shotgun by Edward Morris "*was an accident*."  *Morris* at 308 (emphasis added).  Despite the dual characterization of the Count, the Virginia court nevertheless found that the Expected or Intended Injuries exclusion of the policy applied because the injury that resulted was expected.  *Id.* at 308-312.

result (or were intended to result) because of the actions of the defendants either individually or collusively.

Second, the alleged defamatory statements are all defamatory *per se* under Virginia law because they impugn Spencer in his profession.  Virginia law defines statements that are defamatory *per se* to include "[t]hose which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment," as well as "[t]hose which prejudice such person in his or her profession or trade." *Fleming v. Moore*, 221 Va. 884, 889, 275 S.E.2d 632, 665 (1981).  As an example of language that is defamatory *per se*, the *Fleming* Court stated, "because an attorney is required to adhere to the disciplinary rules, charging an attorney with unethical conduct is defamatory *per se*.  The words themselves must necessarily be damaging to the attorney in his profession." *Id.* at 890, 275 S.E.2d at 636.

As discussed earlier in this brief, all of the alleged defamatory statements in the underlying complaints impute to Spencer the unfitness to perform the duties of an attorney, a want of integrity in his discharge of his duties as an attorney, and prejudice him in his profession as an attorney.  The statements Spencer attributes to the underlying defendants are all defamatory *per se*, and are deemed to be injurious as a matter of law.  Therefore, injury to Spencer is to be presumed from the mere publication of those statements.  Even if it were possible for Spencer to have recovered without proving actual intent, because the statements were defamatory *per se*, the exclusion still applies. The underlying defendants reasonably should have known that their statements would cause harm because they were defamatory *per se*.

In *Erie Ins. Group v. Buckner*, 489 S.E.2d 901 (N.C. App. 1997), the Court of Appeals of North Carolina, applying Virginia insurance law to the application of the expected or intended

25

acts exclusion, noted that "The intentional acts exclusion of the policy in the subject case is common to many personal liability policies and unambiguously excludes coverage for injuries that the insured expects or intends to cause." *Id.* at 903 (citing *Fuisz v. Selective Ins. Co. of America*, 61 F.3d 238 (4th Cir. 1995)). The complaint in that case alleged that "the defendant unlawfully, wilfully, and maliciously committed an assault upon the plaintiff" and that it was made "with a deliberate intent on the part of the defendant to injure the plaintiff." *Buckner*, 489 S.E.2d at 902.

> However, the record indicates that there is no dispute between the parties that Buckner struck Weston in the forehead with his fist. Even assuming arguendo that Buckner did not intend to injure Weston, he should have expected that an injury was likely to occur. Therefore, we hold that the exclusion for expected or intended injuries precludes coverage under the policy.

*Id.* at 904.

Because the law presumes that the statements alleged in the underlying complaints are always injurious, a reasonable person in the underlying defendants' circumstance only could have expected injury to result from the publication of those statements. Because a reasonable person would have expected injury to have resulted from the statements, the allegations of the underlying complaints fall squarely within the Expected or Intended Injury exclusion. The underlying complaints presented no potential that Great Northern would be required to indemnify the defendants, and there was no duty to defend.

### F.  Great Northern had no duty to defend because the insurance does not apply to damages sustained by former partners of McGuireWoods

The "Insureds or Affiliates" exclusion in McGuireWoods' policy clearly states, "This insurance does not apply to any damages, loss, cost or expense arising out of any injury or damage sustained by any . . . former . . . partner of any limited liability company, partnership or joint venture in which any **insured** has or had (at any time) any interest." Form 80-02-2423, p.

1.  Christopher Spencer is a former partner in McGuireWoods.  McGuireWoods acknowledged as much in a letter to Great Northern which was attached as an exhibit of, and incorporated into, Great Northern's Amended Answer.  **Exhibit 5**.  Because Spencer is a former partner in McGuireWoods, the Insureds or Affiliates exclusion applies to preclude any potential for coverage, and Great Northern had no duty to defend.

In an effort to avoid this clear and unambiguous exclusion, McGuireWoods argues that Spencer does not allege that he was a partner in McGuireWoods and that the "Eight-Corners Rule" prohibits looking outside the pleading and the policy to determine whether this exclusion applies.  McGuireWoods' argument is inapt because this is not an issue to be resolved by application of the Eight-Corners Rule.

Where the existence of coverage or the applicability of an exclusion are not dependent on the content of the underlying claims, and instead are dependent upon either (1) who is making the claims, or (2) who the claims are made against, it makes no sense to apply the Eight Corners Rule.  The answer will never be found that way.

Here, whether Spencer is a former partner of McGuireWoods is not something that would conceivably be determined as a matter of fact in resolving Spencer's underlying claims.  On the other hand, both McGuireWoods and Great Northern knew from the outset that Spencer is a former partner in McGuireWoods.  The policy clearly excludes claims made by former partners.  Moreover, under the duty to defend analysis set forth in *Copp*, *supra*, the exclusion would be rendered meaningless unless the Court were able to consider the insured's own letter admission.

In this breach of contract action, both parties agree that Spencer is a former partner in McGuireWoods.   The policy excludes coverage for claims made by former partners.  There is no coverage for Spencer's claims, and Great Northern had no duty to defend.

G.     **Great Northern had no duty to defend because the Legal or Other Professional Services Exclusion applies to preclude the potential for indemnification**

McGuireWoods' policy contains the following exclusion for "Legal or Other Professional Services":

> With respect to all coverage(s) under this contract, this insurance does not apply to any damages, loss, cost or expense arising out of the rendering of or failure to render any:
>
> •       legal service, advice or instruction; or
>
> •       other professional advice or instruction;
>
> regardless of whether or not
>
> •       a claim or suit is brought by any client or any other person or organization; or
>
> •       such service, advice or instruction is ordinary to any **insured's** profession.

Form 80-02-2423, p. 2.

Spencer's claims arise directly from Getchell and McGuireWoods' alleged failure to timely file the trial transcript in the *Grigg* litigation.  Prosecuting an appeal is obviously a legal service.  All of the acts attributed to the defendants in the underlying complaints were done to cover up their alleged malpractice and to pin the blame on Spencer.  Without Getchell and McGuireWoods' alleged acts of malpractice, there would have been no reason for the scheme to cover up their own wrongdoing and to blame Spencer.

While McGuireWoods may be correct that the exclusion cannot be applied merely because of its status as a law firm, its argument is unavailing because, here, the underlying claims arise directly from Getchell and McGuireWoods' allegedly negligent provision of legal services to its client, Wintergreen.  If Getchell and McGuireWoods had timely filed the trial transcript, the appeal would not have been dismissed, the underlying defendants would not have schemed to cover up their wrongdoing by blaming Spencer, and Spencer would never have made

28

his claims.  The Legal or Other Professional Services exclusion applies to negate any potential

for indemnification.  Great Northern owed no duty to defend.

### H.      Getchell and Allcott are not insureds with respect to the claims made only against them

The policy defines "insureds" to include the members and partners of a limited liability

partnership, "but they are insureds only with respect to the conduct of" the limited liability

partnership's business.  Form 80-02-2000, p. 6.  Similarly, employees are insureds, but "only for

acts within the scope of their employment . . . or while performing duties related to the conduct

of" their insured employer's business.  *Id.*  While Getchell may have been a partner, and Allcott

may have been an employee, there is not a single allegation in Spencer's original or amended

complaints against them that they were conducting McGuireWoods' business or that Allcott was

acting within the scope of his employment.

Applying the Eight-Corner's Rule, because there is no allegation that Getchell and

Allcott were conducting McGuireWoods' business or that Allcott was acting within the scope of

his employment, they are not insureds under the policy.  Thus, the original and amended

complaints against them did not create the potential for indemnification and there was no duty to

defend.

### <u>CONCLUSION</u>

For all of the foregoing reasons, Great Northern Insurance Company's motion for

judgment on the pleadings should be granted.

Respectfully submitted,


/S/ Jeffrey R. Schmieler
Jeffrey R. Schmieler (VSB No. 32175)
Alan B. Neurick (*pro hac vice*)
Lisa N. Walters (VSB No. 72291)
Samuel T. Wolf (*pro hac vice*)
*Saunders & Schmieler, P.C.*
The Montgomery Center, Suite 1202
8630 Fenton Street
Silver Spring, Maryland 20910
(301) 588-7717
(301) 588-5073 Facsimile
schmielerj@sslawfirm.com
neuricka@sslawfirm.com
waltersl@sslawfirm.com
wolfs@sslawfirm.com


## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of September, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send a notification of electronic filing (NEF) to the following:

James W. Morris, III (VSB No. 05740)
Matthew D. Green (VSB No. 46913)
Melissa Y. York (VSB No. 77493)
*Morris & Morris, P.C.*
Post Office Box 30
Richmond, Virginia 23218-0030
(804) 344-8300 Telephone
(804) 344-8359 Facsimile
jmorris@morrismorris.com
mgreen@morrismorris.com
myork@morrismorris.com

*Counsel for Plaintiff McGuireWoods LLP*


/S/ Jeffrey R. Schmieler
Jeffrey R. Schmieler (VSB No. 32175)

30